IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **EXPERIENCE INFUSION CENTER, LLC,**<br>**Plaintiff,**<br>V.<br>**TEXAS HEALTH + AETNA INSURANCE HOLDING COMPANY, LLC & AETNA LIFE INSURANCE COMPANY,**<br>**Defendants.** | **CIVIL ACTION NO. 4:17-cv-00034** |

**Declaration of Jim Rutherford**

My name is Jim Rutherford. I am over the age of eighteen years and my mailing address is 1302 Thompson Oil Field Rd, Thompson, Texas 77481. I have never been convicted of a felony or crime of moral turpitude, and I am fully competent to make this declaration. This declaration is based on my personal knowledge.

**Qualifications and Background**

1. I am the managing member and the operator of Experience Infusion Center, LLC (hereinafter "EIC"). EIC is an out-of-network clinic that primarily administers infusion treatment to patients with Lyme disease. The vast majority of EIC's patients are referred by Dr. Patricia Salvato, who focuses her practice on treating patients with Lyme disease. Many EIC patients have health insurance provided by or managed by Aetna. For these patients, EIC provided treatment, and then submitted charges to Aetna.

# EXHIBIT A

**There Were No Accessible Infusion Centers in Aetna's Network.**

2. Aetna did not have an in-network facility that was reasonably accessible to the patients who received infusion services from EIC. I know this because many of EIC's infusion patients brought their Aetna plan documents to the EIC facility, which I carefully studied. These plan booklets listed Aetna's in-network providers, and none of the Aetna plans I reviewed identified any company, clinic or provider who would provide outpatient infusion services. In addition, Dr. Salvato told me about her investigations and conversations with Aetna in the ordinary course of business. She checked with Aetna and learned from Aetna that there were no in-network infusion centers available to the patients she referred to EIC. Moreover, Dr. Salvato also would issue prescriptions for infusion services on EIC letterhead. Any time there was an appeal or a question about a bill, Aetna would request and receive a copy of Dr. Salvato's prescription that directed her patients to our infusion clinic on our letterhead. Despite this obvious reference to EIC, Aetna never protested or suggested that it had an in-network provider who could have provided the infusion care. Of all the objections Aetna has made over the years to avoid paying or recoup a payment, Aetna never objected to a bill on grounds that a hypothetical in-network provider was accessible to EIC's patients. I understand that Aetna is now claiming that there were approximately 500 in-network infusion clinics that were reasonably available to EIC's patients. This is untrue and it is certainly inconsistent with what I knew about Aetna's network at the time the infusion services were provided.

**Aetna made fraudulent and negligent misrepresentations.**

3. Aetna repeatedly made statements on its Explanations of Benefits (hereinafter "EOBs") and in other documents that the bills arising out of EIC's infusion services were payable. When EIC provides treatment to its patients, it submits the bills electronically to Aetna within two to three business days. Normally, EIC submits a notice of an invoice for payment for each day that the treatment is administered. Aetna receives this notice and, shortly therafter, issues EOBs stating whether the claim will be payable and, if so, the allowable amount. EIC and Aetna followed this process for thousands of patients. EIC would render the care and submit the electronic bill, Atena would send EOBs stating the amount to be paid, and then Aetna would pay the allowable amount.

4. I relied on these statements in making my business plan. For me, it made sense to assume that if a claim was payable for Patient #1 when that patient had Lyme disease and Dr. Salvato had ordered IV antibiotics, then Patient #2, who had the same condition, who was treated by the same physician and who had a prescription for the same IV antibiotic therapy should also be payable. I note that Aetna did not simply pre-certify EIC claims; it actually paid these claims, which gave me confidence that my other claims in the future, that were virtually identical, would also be payable.

5. Unfortunately, I have come to learn that when Aetna says they will pay EIC for invoices submitted, they do not really mean it. Despite the fact that Aetna approved and then paid many claims to EIC, Aetna's conduct reveals that it never intended to let EIC keep the money. Instead, Aetna engaged in a pattern of recouping payments it previously made to EIC. These recoupments had no rational basis and no legitimate justification. Moreover, they were unpredictable and they put an enormous strain on EIC's ability to conduct business.

3

6. The following charts provide examples of Aetna's "pay then recoup" strategy. For both patients (#1 and #2), Aetna sent EOBs stating the amount that it would pay for the services rendered (which were actually paid at various times). Later, Aetna began to recoup these payments, sometimes as much as two years after the services were performed. (*See* charts below entitled "Delayed Recoupment Pattern– Patient 1" and "Delayed Recoupment Pattern – Patient 2"). These are just two examples of the "pay then recoup" pattern by Aetna. Indeed, Aetna has engaged in this deceptive strategy for most of EIC's patients. Simply put, Aetna's statements that EIC's bills for infusion services were allowable and payable were false because, at the time these statements were made, Aetna knew that it was going to recoup much of the money at a later date. As explained below, these false statements induced EIC to believe that the treatment being administered to Dr. Salvato's Lyme disease patients was going to be payable, and EIC spent significant amounts of money in reliance on such false representations.

7. I cannot read the minds of the decision-makers at Aetna, but Aetna's conduct makes it abundantly clear that Aetna did not simply change its mind about whether it was going to allow EIC to keep the money it received from Aetna. Aetna was planning on recouping all along. Consider the following:

    a. Aetna often recouped more than the actual amount of benefits paid. For example, on Patient #1, Aetna originally paid $6,400 to EIC for services rendered on April 16, 2013. Later, Aetna then recouped $10,624.92 for services rendered by EIC for that same date of service. Thus, Aetna recouped $4,224.92 more than it actually paid for that date of service. This happened over and over again. In fact, the chart attached entitled "Over Recoupment Chart – Patient 1" contains 19 instances where this happened – and this is just for a single patient!

4

b. Aetna repeatedly gave bogus and inconsistent excuses for its recoupment. For example, Aetna would sometimes pay a claim for a patient, then recoup on grounds that the claim is not medically necessary, and then pay again on the same patient for the same treatment, only to recoup again. These medical necessity arguments were without support or even explanation – other than the simple statement that the recoupment was based on lack of medical necessity. Aetna conducted no audit or other systematic investigation into medical necessity. It simply retroactively recouped on legitimate claims. In this connection, it is important to remember that EIC does not make medical judgments. EIC's job is to provide IV therapy as prescribed by the treating physician. Dr. Salvato determines whether the patient has Lyme disease and then determines the appropriate treatment. EIC could no more question Dr. Salvato's prescription for IV antibiotics than CVS could question a prescription for oral antibiotics prescribed by a patient's treating physician. Thus, Aetna's naked medical necessity objections were unprincipled – especially since it frequently paid the claims for the same treatment for the same condition from the same doctor on similar patients and sometimes for the very same patient. Indeed, I have read an Aetna policy stating that it pays for Lyme disease therapy because it knows such treatment is medically necessary

c. Aetna's recoupments were completely inconsistent in terms of the amounts. Consider the following examples that illustrate what was happening:

  i. Patient A received treatment on April 10, 2013 and EIC submittted a bill for $7,280.00 for the services rendered. Aetna stated that it would pay $6,400.00 and then actually paid that amount. Then, Patient A received essentially the exact same treatment two days later on April 12, 2013 and EIC submitted a bill for 7,130.00 for the services rendered. Aetna stated that it would pay $6,400.00 and then actually paid that amount. However, Aetna later recouped $5,248.00 for that day of treatment.

5

    ii. Patient B received treatment on July 29, 2013 and EIC submittted a bill for $22,010.00 for the services rendered. Aetna stated that it would pay $14,765.60 and then actually paid that amount. Later, Aetna recouped $44.61 for that day of treatment, leaving EIC with a total payment of $14,720.99. Then, Patient B received essentially the exact same treatment one day later on July 30, 2013 and EIC again submitted a bill for $22,010.00. Aetna stated that it would pay $14,780.00 and then actually paid that amount. However, Aetna later recouped $13,248.00 leaving EIC with a total payment of only $1,532.00 for that day of treatment.

    iii. Patient B received medical treatment on December 12, 2013 and EIC submitted a bill for $20,580.00 for the services rendered. Aetna stated that it would pay $4,565.00 and than actually paid that amount. Here, Aetna made no attempt to recoup any payment. However, on the very next day, the same patient received the very same treatment and EIC billed Aetna for the very same amount. Aetna stated it would pay $4,445.00 and then paid that amount. However, this time Aetna later recouped $3,591.80 of the benefits paid.

    iv. Patient B received treatment on December 16, 17, and 18, 2013. EIC billed Aetna the same on each occasion ($20,580.00). In each instance, Aetna stated it would pay just over $4,000 for each date the services were rendered. Even though the treatment was the same, and the amount that Aetna allowed was similar, the recoupment was different. One day Aetna recouped $3,642.80, on another day it recouped $793.00 and on another day it recouped nothing – at least not yet.

**Aetna's false statements significantly harmed EIC.**

8. In reliance on Aetna's statements that EIC's bills were payable (and the fact that Aetna temporarily paid the bills) EIC had to incur hard costs to perform each treatment session. These costs included purchasing the medicine, paying for the nursing shifts and buying the materials. Additionally, there is overhead such as rent and administrative salaries that increase as the patient load increases. Aetna's improper recoupments, which were often taken several years after the services were provided, were significant. For example, for several of EIC's patients, Aetna's recoupments took more than 85% of the money it had originally paid. This sudden elimination of vital revenue severely hampered EIC's operations. If I had known that Aetna was going to engage in a massive recoupment effort that would cripple EIC's cashflow, I would have made business decisions that would have protected EIC. EIC was damaged by Aetna's misrepresentations in terms of the expenses incurred for future treatment as well as in terms of consequential damages resulting from the cashflow crunch created by these recoupments. Aetna is still taking recoupments. Just last week, I received a recoupment notice from Aetna for services that were paid more than two years ago.

I declare under penalty of perjury that the foregoing in based on my personal knowledge and is true and correct.

_____
Jim Rutherford,
Executed on November 20, 2017

...

## Delayed Recoupment Pattern – Patient 1

| Service Date | Stated Amount Allowed (and Ultimately Paid) | Notice of Recoupment | Delay Period | Amount Recouped |
|---|---|---|---|---|
| 12/7/2011 | $4,000.00 | 1/22/2014 | 777 | $2,920.00 |
| 12/30/2011 | $6,400.00 | 1/20/2014 | 752 | $2,587.02 |
| 12/30/2011 | $6,400.00 | 1/21/2014 | 753 | $52.08 |
| 12/30/2011 | $6,400.00 | 1/22/2014 | 754 | $3,200.90 |
| 1/3/2012 | $6,735.00 | 1/29/2014 | 757 | $5,840.00 |
| 1/4/2012 | $6,400.00 | 2/12/2014 | 770 | $1,479.19 |
| 1/4/2012 | $6,400.00 | 2/14/2014 | 772 | $9.47 |
| 1/4/2012 | $6,400.00 | 2/17/2014 | 775 | $4,254.74 |
| 1/9/2012 | $6,607.00 | 1/10/2014 | 732 | $5,840.00 |
| 1/10/2012 | $6,607.00 | 2/10/2014 | 762 | $5,840.00 |
| 1/13/2012 | $6,607.00 | 2/17/2014 | 766 | $95.69 |
| 1/13/2012 | $6,607.00 | 2/18/2014 | 767 | $5,744.31 |
| 1/16/2012 | $6,607.00 | 2/18/2014 | 764 | $376.51 |
| 1/16/2012 | $6,607.00 | 2/24/2014 | 770 | $5,463.49 |
| 1/20/2012 | $6,717.00 | 2/4/2014 | 746 | $5,840.00 |
| 1/23/2012 | $6,607.00 | 2/4/2014 | 743 | $5,436.55 |
| 1/23/2012 | $6,607.00 | 2/7/2014 | 746 | $292.42 |
| 1/23/2012 | $6,607.00 | 2/10/2014 | 749 | $63.03 |
| 1/25/2012 | $6,195.41 | 1/29/2014 | 735 | $554.28 |
| 1/26/2012 | $6,558.00 | 3/25/2014 | 789 | $1,565.49 |
| 1/26/2012 | $6,558.00 | 4/7/2014 | 802 | $4,340.51 |

## Delayed Recoupment Pattern – Patient 2

| Service Date | Stated Amount Allowed (and Ultimately Paid) | Notice of Recoupment | Delay Period | Amount Recouped |
|---|---|---|---|---|
| 7/3/2013 | $14,239.66 | 7/7/2014 | 369 | $13,775.66 |
| 7/3/2013 | $14,239.66 | 7/14/2014 | 376 | $160.34 |
| 7/5/2013 | $464.00 | 7/14/2014 | 374 | $13,936.00 |
| 7/29/2013 | $14,765.60 | 1/16/2016 | 901 | $44.61 |
| 8/12/2013 | $14,400.00 | 7/24/2015 | 711 | $5,868.92 |
| 8/12/2013 | $14,400.00 | 7/24/2015 | 711 | $5,868.92 |
| 8/12/2013 | $14,400.00 | 7/27/2015 | 714 | $276.00 |
| 8/12/2013 | $14,400.00 | 7/27/2015 | 714 | $276.00 |
| 8/12/2013 | $14,400.00 | 1/16/2016 | 887 | $1,047.88 |
| 8/12/2013 | $14,400.00 | 1/16/2016 | 887 | $1,047.88 |
| 8/12/2013 | $14,400.00 | 1/16/2016 | 887 | $1,047.88 |
| 11/14/2013 | $4,315.00 | 5/25/2015 | 557 | $272.72 |
| 11/14/2013 | $4,315.00 | 5/25/2015 | 557 | $272.72 |
| 11/14/2013 | $4,315.00 | 6/29/2015 | 592 | $80.00 |
| 11/14/2013 | $4,315.00 | 6/29/2015 | 592 | $80.00 |
| 11/14/2013 | $4,315.00 | 7/24/2015 | 617 | $3,440.08 |
| 11/14/2013 | $4,315.00 | 7/24/2015 | 617 | $3,440.08 |
| 12/13/2013 | $4,445.00 | 12/29/2014 | 381 | $756.00 |
| 12/13/2013 | $4,445.00 | 1/6/2015 | 389 | $430.40 |
| 12/13/2013 | $4,445.00 | 1/7/2015 | 390 | $2,405.40 |
| 12/16/2013 | $4,165.00 | 1/7/2015 | 387 | $1,909.60 |
| 12/16/2013 | $4,165.00 | 1/12/2015 | 392 | $430.40 |
| 12/16/2013 | $4,165.00 | 1/19/2015 | 399 | $378.00 |
| 12/16/2013 | $4,165.00 | 2/2/2015 | 413 | $268.28 |
| 12/16/2013 | $4,165.00 | 2/10/2015 | 421 | $113.40 |
| 12/16/2013 | $4,165.00 | 2/16/2015 | 427 | $335.60 |
| 12/16/2013 | $4,165.00 | 2/19/2015 | 430 | $207.52 |
| 12/18/2013 | $4,165.00 | 2/19/2015 | 428 | $751.52 |
| 12/18/2013 | $4,165.00 | 3/2/2015 | 439 | $41.48 |

9

## Over Recoupment Chart – Patient 1

| Service Date | Amount Billed | Stated Amount Allowed (and Ultimately Paid) | Total Recoupments | Total Amount Recouped | Balance after Recoupment |
|---|---|---|---|---|---|
| 4/16/2013 | $7,130.00 | $6,400.00 | 3 | $10,624.92 | -4224.9 |
| 9/5/2014 | $1,585.00 | $868.00 | 1 | $1,048.00 | -180.0 |
| 9/8/2014 | $1,585.00 | $868.00 | 1 | $1,048.00 | -180.0 |
| 9/3/2014 | $1,585.00 | $468.00 | 1 | $1,124.13 | -656.1 |
| 3/20/2013 | $7,130.00 | $6,400.00 | 4 | $8,212.32 | -1812.3 |
| 3/27/2013 | $7,280.00 | $6,400.00 | 10 | $7,876.00 | -1476.0 |
| 1/23/2015 | $7,150.00 | $0.00 | 2 | $1,868.80 | -1868.8 |
| 9/11/2014 | $1,585.00 | $0.00 | 1 | $1,310.00 | -1310.0 |
| 9/22/2014 | $1,585.00 | $0.00 | 1 | $1,310.00 | -1310.0 |
| 9/24/2014 | $1,585.00 | $0.00 | 1 | $1,310.00 | -1310.0 |
| 9/29/2014 | $1,585.00 | $0.00 | 1 | $1,310.00 | -1310.0 |
| 10/6/2014 | $1,585.00 | $0.00 | 1 | $1,310.00 | -1310.0 |
| 1/19/2015 | $6,900.00 | $0.00 | 1 | $1,114.40 | -1114.4 |
| 8/28/2014 | $1,585.00 | $0.00 | 1 | $1,048.00 | -1048.0 |
| 9/2/2014 | $1,585.00 | $0.00 | 1 | $1,048.00 | -1048.0 |
| 1/26/2015 | $14,300.00 | $0.00 | 3 | $934.40 | -934.4 |
| 1/21/2015 | $6,900.00 | $0.00 | 1 | $865.00 | -865.0 |
| 11/25/2012 | $0.00 | $0.00 | 1 | $490.05 | -490.1 |
| 2/2/2015 | $3,500.00 | $0.00 | 1 | $192.00 | -192.0 |